WOLF HALDENSTEIN ADLER
  FREEMAN AND HERZ LLP
FRANCIS M. GREGOREK (144785)
BETSY C. MANIFOLD (182450)
FRANCIS A. BOTTINI, JR. (175783)
Symphony Towers
750 B. Street, Suite 2770
San Diego, California 92101
Telephone: (619) 239-4599

WOLF HALDENSTEIN ADLER
  FREEMAN AND HERZ LLP
FRED T. ISQUITH
LAWRENCE P. KOLKER
MICHAEL JAFFE (133332)
270 Madison Avenue
New York, New York  10016
Telephone: (212) 545-4600

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUNSHINE WIRE AND CABLE DEFINED BENEFIT PENSION PLAN TRUST DTD 01/01/92, On Behalf of itself and All Others Similarly Situated, ) ) ) ) ) | CASE NO. <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| Plaintiff, ) ) | <u>DEMAND FOR JURY TRIAL</u> |
| VENTRO CORPORATION, DAVID P. PERRY, JAMES G. STEWART, ROBIN A. ABRAMS, WILLIAM C. KLINTWORTH, JR., MARTHA D. GREER, DAVID A. WEBER, JAMES S. WAMBACH, CHARLES R. BURKE, BROOK H. BYERS, JONATHAN D. CALLAGHAN, PAUL J. NOWAK, JOHN A. PRITZKER, NAOMI O. SELIGMAN, L. JOHN WILKERSON, MORGAN STANLEY & CO., INCORPORATED, FLEETBOSTON ROBERTSON STEPHENS, INC., CHASE SECURITIES, INC., and DEUTSCHE BANK SECURITIES, INC., ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

_____
__

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

**SUMMARY OF THE ACTION**

1. This is a securities fraud class action on behalf of all persons who purchased Ventro Corporation ("Ventro" or the "Company") publicly traded debt instruments between March 29, 2000 and December 6, 2000 (the "Class Period"), against Ventro and its top officers for violations of the federal securities laws arising out of defendants' dissemination of false and misleading statements concerning the Company's business model and its earnings for fiscal 2000.

2. Ventro builds and operates platforms for vertical business-to-business ("B2B") e-commerce marketplace companies. Ventro, previously called Chemdex, attempts to provide a secure Internet-based solution which permits companies to buy products from suppliers and resell them to customers while streamlining business processes. By December 1999, defendants knew that Ventro's existing business model did not work. Moreover, by the beginning of the Class Period it was evident to defendants that Ventro did not possess the technology to successfully compete as a marketplace. Defendants knew this would severely impair Ventro's future revenue growth. However, defendants wanted to raise additional money through debt offerings before the bottom fell out of Ventro's stock price. Thus, defendants continued to make positive but false statements about Ventro's business and future revenues. As a result, Ventro's stock traded as high as $243-1/2 per share during the Class Period and its convertibly subordinated notes traded as high as $829.40.

3. In addition to having actual knowledge of the falsity of their statements, each of the defendants had the motive and

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS        - 1 -

opportunity to perpetrate the fraudulent scheme and course of business described herein, in order to issue $250 million in convertible notes in April 2000 and to sell or otherwise dispose of $54 million worth of their own Ventro shares at prices as high as $220 per share, or 100 times higher than the price to which Ventro shares dropped at the end of the Class Period as Ventro's true prospects began to reach the market.  Ventro had also filed a registration statement to sell an additional 1.8 million shares of Ventro stock, including 120,000 by its CEO, when market demand declined somewhat in late March 2000 for B2B stocks, causing the secondary offering not to take place.

4.   Then, on December 6, 2000, Ventro announced a restructuring in which it closed down two out of three of its main B2B marketplaces.  On January 1, 2001, Ventro's CEO admitted in an interview that by December 1999 he and the other defendants realized that Ventro's business model of independent marketplaces didn't make sense.

5.   By this time Ventro's stock had declined to less than $2 per share and its convertible subordinated notes to $169.40, inflicting billions of dollars of damage on plaintiff and the Class.  Defendants' misconduct has wiped out over $4 billion in market capitalization as Ventro stock has fallen 99% from its Class Period high of over $243 per share as the truth about Ventro, its operations and prospects began to reach the market.

6.   Ventro ultimately announced no revenue for the fourth quarter 2000, a loss of $618 million for fiscal 2000, the resignations of its Chief Operating Officer, its Chief Financial

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 2 -

Officer and its Vice President of Marketing, and acknowledged it had refunded millions of dollars in fees it had previously recognized as revenue. Ventro also announced it would commence a tender offer for the $250 million in convertible notes issued in April 2000 for 27% of principal.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, and Sections 11 (15 U.S.C. § 77k), 12(a)(2) (15 U.S.C. § 77l) and 15, (15 U.S.C. § 77o) of the Securities Act of 1933. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

8. Venue is proper here pursuant to §27 of the 1934 Act. The acts and transactions giving rise to the violations of law complained of occurred here. Assignment of this action to the San Francisco Division is appropriate as a substantial part of the acts or omissions identified herein occurred in San Francisco County.

## THE PARTIES

9. Plaintiff purchased shares of Ventro convertible subordinated notes as detailed in the attached certification and was damaged thereby.

10. Defendant Ventro maintains its headquarters at Mountain View, California.

11. (a) Defendant David P. Perry ("Perry") was, during the Class Period, President, Chief Executive Officer, and a director of the Company. Pursuant to a Registration Statement filed in March 2000, Perry filed to sell 120,000 shares of his Ventro

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 3 -

stock.  This offering was canceled when B2B stocks declined in value in late March 2000.

(b)  Defendant Robin A. Abrams ("Abrams") was, during the Class Period, Chief Operating Officer of the Company.  On February 20, 2001, Ventro announced Abrams' resignation.

(c)  Defendant  William C. Klintworth, Jr. ("Klintworth"), was, during the Class Period, a director of the Company and CEO and Chairman of Promedix.  During the Class Period, while in possession of confidential information, Klintworth sold 1,200,000 shares of Ventro stock at an artificially inflated price of $22.00 per share, for proceeds of more than $24 million and gifted an additional 175,000 shares when the price was as high as $220 per share.

(d)  Defendant Martha D. Greer ("Greer") was, during the Class Period, Vice President-Marketing of the Company. During the Class Period, while in possession of confidential information, Greer sold 7,000 shares of Ventro stock at artificially inflated prices as high as $165 per share, for proceeds of more than $1.1 million. On February 20, 2001, Ventro announced Greer's resignation.

(e)  Defendant James G. Stewart ("Stewart") was, during the Class Period, Chief Financial Officer and Assistant Secretary of the Company.  On February 20, 2001, Ventro announced Stewart's resignation.

(f)  Defendant James S. Wambach ("Wambach") was, during the Class Period, Vice President-Worldwide Sales of the Company. During the Class period, while in possession of confidential information, Wambach sold 17,000 shares of Ventro stock at

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 4 -

artificially inflated prices as high as $187.65 per share, for proceeds of more than $3.19 million.

(g) Defendants David A. Weber ("Weber") was, during the Class Period, Vice President-Supplier Relations to the Company.   During the Class Period, while in possession of confidential information, Weber sold 17,000 shares of Ventro stock at artificially inflated prices as high as $167.17 per share, for proceeds of more than $2.6 million.

(h) Defendant Charles R. Burke ("Burke") was, during the class period, a director of the company.

(i) Defendant Brook H. Byers ("Byers") was, during the class period, a director of the company.

(j) Defendant Jonathan D. Callaghan ("Callaghan") was, during the class period, a director of the company.

(k) Defendant Paul J. Nowak ("Nowak") was, during the class period, a director of the company.

(l) Defendant John A. Pritzker ("Pritzker") was, during the class period, a director of the company.

(m) Defendant Naomi O. Seligman ("Seligman") was, during the class period, a director of the company.

(n) Defendant John Wilkerson ("Wilkerson") was, during the class period, a director of the company.

(o) Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") was, at all relevant times herein, a registered broker-dealer and member of the National Association of Securities Dealers, Inc. ("NASD"). Morgan Stanley was a co-manager of the Offering and substantially participated in the

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 5 -

wrongs alleged herein. At all relevant times, Morgan Stanley had a duty to promptly disseminate truthful and accurate information with respect to the Offering.

(p) In addition to Morgan Stanley, FleetBoston Robertson Stephens Inc. ("FleetBoston"), Chase Securities Inc. ("Chase"), and Deutsche Bank Securities, Inc. ("Deutsche Bank") served as co-managers of the Offering. Each of these companies maintains operations and conducts extensive business activities in this District. Collectively, these companies are known as the "Underwriter Defendants".

12. The parties listed in ¶11(a)-(n) are referred to as the "Individual Defendants." They are liable for the false statements pleaded herein, as those statements were each "group-published" information for which they were collectively responsible. Defendant Perry, by reason of his stock ownership and position with Ventro, was a controlling person of Ventro. Ventro controlled each of the Individual Defendants. These controlling persons are liable under §20(a) of the 1934 Act.

**SCIENTER AND SCHEME ALLEGATIONS**

13. The Individual Defendants are Ventro's top executives. They ran Ventro as "hands-on" managers, dealing with important issues facing Ventro's business, i.e., its business model, its ability to eventually report a profit, Ventro's market share position, and its ability to achieve growth in its business in 2000-2001.

14. Ventro went public in July 1999 under the name Chemdex, offering an on-line marketplace for life science research products. Ventro subsequently acquired Promedix to provide an

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS            - 6 -

on-line marketplace for specialty medical products.  While the Company was successful in raising large sums of money, it was not successful in actually making money.  By December 1999, the Individual Defendants realized the Company's business model did not work.  However, the defendants wanted to take advantage of the Company's high stock price and raise additional capital before disclosing that the model did not work.

15.  In December 1999, Ventro announced the establishment of Broadlane jointly with Tenet Healthcare ("Tenet") with the intention of building an e-commerce platform that would permit thousands of health care purchasing systems to speak a common language on-line, thus eliminating enormous inefficiencies in the current ordering process.  Tenent owned 56% of Broadlane and Ventro owned 18%.  However, once the joint venture began, it became clear that Ventro did not have the technology that was suitable for Broadlane's use.  Since this was a venture  in which Ventro was  a part owner, this was of particular concern to defendants as they realized other unrelated customers would not be as forgiving.  Because of the significance of this problem, defendants were each aware of the issue.

16.  Each of the defendants was personally familiar with the problems with Ventro's business model as they monitored Ventro's sales, and projected profitability and monitored operations via reports from Ventro's Finance Department which were generated and provided to management on a regular basis.  As a result of the Individual Defendants' monitoring, each defendant was aware that Ventro would be unable to meet its projected results in 2000.  However, because the "appearance" of future growth was so

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS           - 7 -

critical to defendants' plan to inflate the price of Ventro shares and raise needed capital, defendants continued to maintain throughout the Class Period that Ventro's model was succeeding, results were exceeding expectations and customer and transaction growth was continuing, when, in reality, defendants knew that its model did not work and its technology was not adequate to successfully compete as a marketplace company.

17.  In addition to having actual knowledge of the falsity of their statements, each of the defendants had the motive and the opportunity to perpetrate the fraudulent scheme and course of business described herein, in order to sell $250 million worth of Ventro convertible notes and sell or otherwise dispose of personal holdings of Ventro stock at prices as high as $220 per share or 100 times higher than the price to which Ventro shares dropped at the end of the Class Period, as Ventro's true prospects began to reach the market.

18.  During early 2000, defendants were engaged in preparing a huge $250 million subordinated note offering at the same time Ventro was developing three additional marketplaces:  Promedix for speciality medical products, Broadlane for high-volume hospital and medical supplies, and Industria Solutions for the fluid processing market.  They were also preparing a huge 1.8 million share secondary stock offering in which Perry and Klintworth were to sell 120,000 shares each of their Ventro stock. This offering was canceled when B2B stocks declined significantly in late March 2000, but is indicative of defendants' motivation to inflate the price of Ventro stock.

**BACKGROUND TO CLASS PERIOD**

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                - 8 -

19.  Ventro went public on July 30, 1999, at $15 per share, raising $104.6 million, excluding the overallotment.  At the time of the offering, Ventro (then named Chemdex) referred to itself as a leading provider of e-commerce solutions to the life sciences industry, in terms of the number of suppliers and products available.  The IPO prospectus stated:

> The Chemdex Marketplace is a database of laboratory research products that may be sold and purchased through a secure, Internet-based purchasing solution. The Chemdex Marketplace utilizes an advanced search engine and software to allow users to easily identify, locate and purchase life sciences research products, such as chemicals and equipment used in laboratory experiments, from a database of approximately 225,000 products from approximately 110 suppliers.  We have agreements in place with additional suppliers and distributors to add approximately 550,000 products to the Chemdex Marketplace during 1999.
>
> *        *        *
>
> Our strategic objective is to expand our position as a leading e-commerce solution for the life sciences research products market.  In order to implement this objective, we intend to capitalize on the fact that we are one of the first companies to offer an e-commerce solution to the life sciences research products market and build recognition of the Chemdex brand name.  To accomplish this, we have entered into strategic relationships with VWR Scientific Products, Inc., one of the laboratory supply industry's largest distributors, and the Biotechnology Industry Organization, a leading industry organization. Further, we intend to increase usage of the Chemdex Marketplace, increase our productivity, maintain technological leadership and expand internationally.

20. Ventro had struggled prior to its IPO to sign up suppliers to its market.  Because suppliers were not anxious to sign up, Ventro resorted to offering equity in exchange for buyers and suppliers contracting to be part of Ventro's marketplace, including a deal with VWR Scientific Products.

21.  The IPO was successful as defendants were able to convince the market that its business model was viable.

22. One consequence of the IPO was that it was more difficult for Ventro to exchange equity for business since it was a public company. Thus, it began to trade equity indirectly by forming joint ventures. Each new e-market was essentially a private company that acted as a financial instrument. In this way, Ventro was able to obtain critical mass, such that it appeared to be successfully selling its concept to buyers and sellers in the chemical industry notwithstanding the fact that it still had no competitive advantage from which it could generate legitimate profits.

23. As a result, by late December 1999, the Company's stock reached more than $130 per share. However, by the time Ventro reported its fourth quarter 1999 results in early 2000 it faced increasingly bleak short-term and long-term prospects as defendants knew the model did not work, that Ventro's technology was inadequate and that competitors were developing better solutions. Nevertheless, defendants wanted to raise more money before the truth began to be revealed about Ventro's true prospects. Thus, defendants disseminated false information about Ventro's business and prospects concealing the fact that, even by December 1999, the model did not work and the Company did not have the technology adequate to run a marketplace to satisfy even its joint venture partners.

24. On January 21, 2000, the Company announced that:

> "We are honored to be chosen as the industry standard by such an influential organization in the biotechnology community," said Robin Adams, COO of Chemdex. "BIOCOM's section of Chemdex as its preferred provider of e-commerce solutions further demonstrates the value and advantages of our end-to-end solution to the biotechnology marketplace. By

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                - 10 -

endorsing our solution, BIOCOM members will be able to streamline supply chain inefficiencies and ultimately increase researcher productivity."

25. On January 21, 2000, Prudential Volpe Technology issued a report on Ventro "initiating coverage," written by Timothy Getz. Because this was Getz's first report on Ventro, it was not issued until Getz had met with Ventro's top management and had given them a draft of his report to review before it was issued, so that it could be corrected if necessary. The report, which was based on statements by top Ventro management (including Perry and Stewart) forecast a 2000 loss of $2.03, rated the Company a "Strong Buy," and stated:

> In our view, Chemdex effectively brings together buyers and suppliers in large, highly fragmented vertical markets, and enables them to easily find and transact with each other. We believe that Chemdex (i) delivers powerful and quantifiable business benefits to all participants in its marketplaces; (ii) is establishing a critical mass of leading suppliers and customers with the opportunity to achieve a near-monopoly position in its chosen verticals; and (iii) will gain significant leverage from its Promedix.com acquisition. We are initiating coverage with a STRONG BUY rating on CMDX and are setting our 12-month price target at $125.
>
> ... While competition is significant in Chemdex's playing field, we believe the Company is quickly achieving a critical mass of suppliers and customers and is well-positioned to compete effectively against its competitors.
>
> *       *       *
>
> The Chemdex Marketplace, a fully transnational Web-based electronic catalog and ordering system, benefits researchers (buyers),the corporate enterprise, and suppliers . . .
>
> * Large, untapped market opportunity. Chemdex addresses three large and growing markets: (i) business-to-business Internet commerce, which is estimated to increase from $43 billion in 1998 to more than $1.4 trillion in the [sic] 2003; (ii) the $15-20

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                - 11 -

billion life sciences research products industry, which is largely an untapped market; and (iii) the $68 billion specialty healthcare products market.

* * *

*  Chemdex has an attractive revenue model, featuring multiple and recurring revenue streams.  The Company earns revenue from product sales and monthly usage fees.

26.  On January 24, 2000, the Company jointly announced with DuPont the formation of a joint business.  The release stated in part:

DuPont and Chemdex™ Corporation today announced the formation of Industria Solutions, Inc., a new business-to-business (B2B) e-commerce company that will streamline the procurement of materials for the $75 billion worldwide fluid processing market.

* * *

Chemdex President and CEO David Perry, DuPont Executive Vice President and Chief Operating Officer Dennis Reilly, and Jon Callahan, general partner with CMGI's@Ventures, have joined Industria's board of directors.  "Industria has enormous momentum.  We have, and continue to build, a talented and seasoned management team from leading Fortune 500 companies," said Dean Dorman, interim CEO of Industria. "Industria employees are currently developing an initial version of Industria's B2B e-commerce solution at our Mountain View, California headquarters."

* * *

"Industria addresses a fragmented market that is primed for a Chemdex-like solution, creating tremendous value for all participants," said David Perry, president and CEO of Chemdex.  "The company has been created with a fully-realized business model, proven technology, and partners with the knowledge and experience to quickly move the fluid processing materials supply chain online. Chemdex's marketplace platform, experienced IT staff and expertise in developing industry-specific B2B e-commerce solutions will help reduce Industria's time-to-market form years to months."

27.  On February 9, 2000, First Union Securities issued a

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 12 -

report "initiating coverage" on Ventro, written by Charles Wittmann. Because this as Wittmann's first report on Ventro, it was issued only after Wittmann had extensive discussions with Perry and Stewart and was based on, and repeated, information provided by them. The information provided to Wittman was provided with the intention it would be repeated in an analyst report disseminated to the public. The report forecast a 50% three-to-five year EPS growth rate and also stated:

-- Chemdex Has The "First Mover" Advantage As Well As Technological Expertise In Its Vertical. As one of the first publicly traded B2B companies focused on a particular vertical, we believe that Chemdex has established a first-mover advantage, as well as technological expertise in the scientific-products vertical that the company should continue to leverage.

-- Chemdex Has Established Critical Mass Among Buyers And Suppliers In The Marketplace And Has Strong Sales Momentum. Like companies such as Ariba and Commerce One, Chemdex' strength lies in its ability to draw buyers and suppliers onto the Chemdex Marketplace. Currently Chemdex has over 80 enterprise buyers, approximately 2,100 suppliers, and 1.1 million products through the Chemdex Marketplace. In the future, we believe that the Chemdex Marketplace. In the future, we believe that the Chemdex Marketplace will continue to attract buyers, which will continue to attract suppliers, creating a self-propagating process.

28. On February 11, 2000, Ventro announced it had closed its Promedix.com acquisition. Ventro represented that Tenet, the second largest hospital chain in the U.S.,had entered into an exclusive purchasing agreement with Promedix.com whereby Tenet's 113 hospitals, on an exclusive basis, and 397 additional hospitals affiliated with Tenet's purchasing organization, would purchase its specialty medical products through Promedix.com.

29. On February 14, 2000, USBancorp Piper issued a report

"initiating coverage" on Ventro, written by Jon Ekoniak. Because this was Ekoniak's first report on Ventro, it was issued only after Ekoniak had extensive discussions with Perry and Stewart and was based on and repeated information provided by them.  The information provided was provided with the intention it would be repeated to the market in an analyst report.  The report forecast 2001 revenues of $450 million and stated:

> Recently, the Company has aggressively expanded into additional vertical markets, leveraging its B2B experience and industry traction to speed the time to market for new vertical offerings.  Chemdex is targeting (a) the specialty medical products space through its recently-closed acquisition of Promedix; (b) the high volume medical supplies space through its strategic partnership with Tenent Healthcare and; (c) the fluid processing market through the Company's joint venture company, Industria, formed with DuPont.

>                    *     *     *

> Chemdex's main line of business is in operating an on-line life sciences marketplace that allows research scientists to shop for and purchase over 1 million life sciences products including reagents, speciality chemicals, chemical compounds, research instruments, and other scientific equipment over the Internet. Detailed product information is provided for each item, allowing researchers and purchasers to make the same type of highly informed buying decisions that they would make off-line, but in a much more efficient manner.

> Chemdex enables research scientist[s] to procure needed products in a more efficient and low-cost manner, saving valuable time, reducing errors, and substantially reducing the order processing costs. By automating the purchasing process, Chemdex is able to provide companies with spending data and analysis to help them make better procurement decisions. Chemdex's solutions can be tailored to fit each client organization's procurement procedures, and will support features such as contract pricing, preferred supplier lists, and approval workflow.  Essentially, Chemdex allows clients to streamline their procurement process and outsource the related technology, allowing them to focus more on their core business activities.

>                    *     *     *

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 14 -

Chemdex's acquisition of Promedix marks a significant change in the Company's business model.  As Chemdex expands into additional vertical spaces, their revenue growth will become less and less dependent on their performance within the life sciences industry, and their valuation will continue to evolve toward that of a multi-vertical player.

Competition

As Chemdex's model evolves more and more into a multi-vertical strategy, the Company will continue to face an expanded range of competitors. These competitors will fall into three major categories: large industry participants, targeted vertical e-commerce companies, and broader-based horizontal or multi-vertical e-commerce solutions.

**FALSE AND MISLEADING STATEMENTS
DURING THE CLASS PERIOD**

30.  On February 15, 2000, Chemdex (Ventro) announced its financial results for the fourth quarter and 12 months ended December 31, 1999.  The release stated:

Revenues for the fourth quarter of 1999 marked the best quarter in Chemdex history at $19,278,000 from $26,000 in the same period last year.  Net loss for the quarter was $15,260,000, or a loss of $0.49 per share.  During the corresponding quarter of 1998, the net loss was $4,398,000, or at a loss of $2.30 per share.

*      *      *

"We are excited with the market reception to our end-to-end supply chain solution for the life sciences market.  The growth in customers and revenues is the direct result of our success in meeting the unique needs of the enterprise customer, life sciences researcher and suppliers of key products to this significant and growing industry," said David Perry, President and CEO of Chemdex.  "Our strong position in this market has allowed us to broaden our leading-edge technology to solve supply-chain challenges for the life sciences as well as other industries."

31.  On February 15, 2000, subsequent to the release of its fourth quarter 1999 results, Chemdex held a conference call for analysts, money and portfolio managers, institutional investors

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 15 -

and large Chemdex shareholders to discuss Chemdex's 1999 results, its business and its prospects.  During the call -- and in follow-up conversations with analysts -- Perry and Abrams stated:

> !    The strong fourth quarter results were due to a larger customer base and improved penetration.
>
> !    Chemdex was on track to achieve its goal of 50% penetration of a market within 18 months of implementation.
>
> !    The integration of Promedix was proceeding smoothly with Version 1.0 of the Promedix solution released and a new version soon to be released.
>
> !    The Company was on track to have 2000 and 2001 revenues of $144+million and $450+ million, respectively.

32.  On February 16, 2000, USBancorp Piper issued a report on Chemdex (Ventro) by Jon Ekoniak, written after discussions with Perry and Abrams, including on the conference call, which was based on and repeated information provided by them.  The report forecast 2000 and 2001 revenues of $144 million and $450 million, respectively, and stated:

> -- Chemdex posted solid Q4:99 results, continuing its impressive ramp and consolidating its market leading position in the life sciences industry.
>
> *       *       *
>
> -- Chemdex is making great progress in integrating its Promedix acquisition, which closed on February 11. They have already released Version 1.0 of the integrated Promedix solution, and will be releasing a new version shortly.  In terms of revenue, we expect Promedix to contribute $2 million in Q3:00 and $8 million in Q4:00.
>
> *       *       *
>
> -- Chemdex is continuing to evolve its business model toward a multi-vertical structure.  In our opinion, the Company will be valued off revenues from its wholly owned business units, as well as its equity

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                 - 16 -

stakes in new companies.

* * *

In expanding, Chemdex will provide its new companies with a significant edge in time to market, by leveraging its technological and operational capabilities, existing industry partnerships, and management bandwidth. Depending on the landscape of existing players within a vertical space, Chemdex will determine whether to buy or build.

33. On February 16, 2000, Prudential Volpe Technology issues a report on Chemdex (Ventro) by Timothy Getz, written after discussions with Perry and Abrams, including on the conference call, which was based on and repeated information provided by them. It stated:

In our view, the Company has quickly transitioned itself from an essentially raw start-up in 1998 to a poised operating outfit with astonishing speed. We are just as impressed with the Company's new strategy to leverage its valuable assets (technological expertise, infrastructure, and back-office capabilities) to exploit opportunities in different vertical markets (*e.g.*, specialty medical and hospital supplies industries). With these valuable assets, Chemdex is able to bring tremendous time-to-market advantages to the new vertical, quickly and less expensively. As a testament to this, Promedix.com is up and running after only 6 months -- as a frame of reference it took Chemdex 18 months to get to this stage from a platform perspective.

* * *

In our view, Chemdex is a leading example of a new category of company that will dominate business-to-business commerce over the next decade: the B2B on-line intermediary. Chemdex effectively brings together buyers and suppliers in large, highly fragmented vertical markets, and enables them to easily find and transact with each other. We continue to believe that Chemdex: (i) delivers powerful and measurable business benefits to all participants in its marketplaces; (ii) has the technical expertise, infrastructure, and back-office capabilities to quickly establish critical mass of leading suppliers and customers with the opportunity to achieve a near-monopoly position in its chosen vertical and (iii) is quickly expanding from a leader in a single vertical

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 17 -

market to a leader in several vertical markets.

34.  On February 16, 2000, Deutsche Banc Alex. Brown issued a report on Chemdex (Ventro) by C. Laughlin, written after discussions with Perry and Abrams, including on the conference call, which was based on and repeated information provided by them.  The report forecast 2000 and 2001 revenues of $150 million and $460 million, and stated:

> -- We are raising our 2000 and 2001 revenue estimates to reflect upside in the life sciences business (the core Chemdex business), as well as the recent acquisition of Promedix.com (which positions Chemdex in the specialty medical supplies vertical).  The anticipated ramp in the Promedix.com business is significant (and well above our initial thinking), with expected contribution starting in 3Q00.  We are also raising our gross margin assumptions for the combined company.

> *       *       *

> To reflect the current trends, as well as the favorable margin dynamics in the specialty medical supply market, we are raising our 2000 and 2001 gross margin assumptions to 5.9% (from 5.2%) and 7.2% (from 6.9%).  Remember, as Chemdex/Promedix.com ramps its enterprise (buy-side) customer base, the company should have greater buying power with its suppliers, which should in turn lead to better supplier discounts and higher gross margins.

> *       *       *

> In addition, we believe Chemdex is well positioned to leverage its leading marketplace and procurement technologies to extend into additional vertical through partnership or acquisition, which could significantly expand the company's addressable market and therefore the stock's valuation.  We believe the Chemdex value propositions is significant and highly transferable across different vertical.  Enterprise get better control and lower procurement costs, researchers get one-stop shopping and electronic ordering capabilities, and suppliers gain expanded channels and reduced distribution costs.

35.  As a result of these positive statements, by mid-February 2000 Ventro's stock was trading at above $243 per

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 18 -

share.

36. On February 22, 2000, Ventro was officially formed, termed a B2B holding company established to leverage the infrastructure and assets developed by Chemdex to target additional vertical markets in the world. The joint venture with Tenet, called Broadlane, had been formed, which was a health care marketplace.

37. On February 22, 2000, subsequent to the announcement of the formation of Ventro, the Company held a conference call for analysts, money and portfolio managers, institutional investors and large Ventro shareholders to discuss the new business and its prospects. During the call -- and in follow-up conventions with analysts -- Perry and Abrams stated:

!    The Company's new structure, including joint ventures as partially owned subsidiaries, would permit Ventro to spin out subsidiaries as needed.

!    These agreements with powerful partners would permit Ventro to expand its market footprint.

!    Ventro was on track to becoming the preferred means for traditional companies to quickly implement an e-commerce strategy which would lead to strong growth in mass, and in revenues for Ventro.

38. These statements were repeated to the market in analyst reports, including in a USBancorp Piper report and a Prudential Volpe Technology report.

39. On March 24, 2000, Broadlane announced that it had concluded agreements with several leading organizations in the health care industry to utilize its e-commerce solution for health care purchasing:  "Broadlane is unique in the highly fragmented health-care purchasing marketplace because it uses Ventro's proven e-commerce platform as well as BuyPower's

substantial customer base, supplier relationships and track records of offering exceptional pricing to the members."

40.  On April 3, 2000, Ventro issued $250 million in 6% Convertible Subordinated Notes due 2007 pursuant to a Prospectus/Registration Statement dated March 30, 2000. The Prospectus stated:

> We provide a secure, Internet-based solution that enables us to buy products from suppliers and resell them to customers while streamlining business processes, increasing productivity and reducing costs through the supply chain.  Our platform employs a robust database architecture, advanced search engines and transaction software that enable users to easily identify, locate and purchase the products they need. We have entered into agreements with leading companies in each of the Ventro marketplaces, including VWR Scientific Products, Tenent Healthcare and DuPont. With our strategic relationships with Ariba, Commerce One, Concur Technologies and IBW, we offer customers and suppliers the ability to directly connect their enterprise software to our marketplace.  We believe this extensive system integration provides a key competitive advantage for Ventro companies, as customers and suppliers can directly link their front and back offices to the Ventro marketplace and increase the automation of their procurement and order fulfillment processes.  We also provide professional and implementation services to enable market participants to take full advantage of our operating capabilities.
>
> Our strategy is to build and operate leading vertical business-to-business e-commerce marketplace companies by:
>
> ! Leveraging Our Platform.  We will use our technology architecture, operating capabilities and marketplace experience, as well as our strategic relationships, to enter new vertical markets rapidly.
>
> ! Being the Market Leader in the Most Attractive Markets.  We will target large, fragmented markets where we believe the aggregation enabled by our marketplace solution will provide significant value to customers and suppliers.
>
> ! Scaling Operations Rapidly.  We plan to pursue markets where we can join with industry leaders or make acquisitions to build our expertise and enhance

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS              - 20 -

our position to rapidly achieve scale and reinforce our first mover advantage.

! Expanding Internationally.  The international scope of the interest, the global reach of many of our customers and suppliers and the worldwide demand for the products in the markets we serve provides us with an opportunity to grow our marketplaces internationally.

*    *    *

Tenent.  Our strategic relationship with Tenent encompasses two Ventro marketplaces.  In December 1999, we and Tenent announced the formation of Broadlane.  Tenet will provide Broadlane access to the benefits of its existing buyer and supplier contracts of its BuyPower organization, which serves as a group purchasing organization for Tenet's hospitals and other members. BuyPower, according to Tenet, manages over 400 vendor contracts that generate more than $3 billion in annual purchases of total supplies, which are used by Tenent as well as non-Tenet institutions, including 10 acute care hospitals, 531 non-acute facilities and approximately 45,000 physicians.  Two key members of Broadlane's management team were formerly officers of Tenet.

Concurrent with the formation of Broadlane, Tenet and Promedix entered into an arrangement under which Promedix will be the exclusive supplier to entities for which Tenet acts as a purchasing agent of business-to-business e-commerce solutions for the purchase of specialty medical products for an eight-year term.

We believe Tenet's network of customers and its purchasing power with suppliers provide Broadlane and Promedix with an advantage in obtaining critical mass within their respective marketplaces.

41.  The Prospectus contained risk factors which included the risk that "Our business model is not proven and may not be successful," but even this statement was misleading, as by the time this document was prepared, defendants had already recognized that the idea of independent marketplaces did not make sense.  Moreover, Ventro did not have technology suitable for Broadlane to be successful, which not only threatened the

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS        - 21 -

success of that business but Ventro's entire business.

42. From late March to mid-April 2000, Ventro's stock declined significantly as the NASDAQ dropped, particularly among B2B stocks. This caused defendants to cancel a secondary offering of 1.8 million shares due to the drop in value of its shares. The secondary offering had included 120,000 shares offered by each Perry and Klintworth. By April 3, 2000, Ventro's stock had dropped to $47-3/16. However, Ventro's stock continued to be inflated as defendants concealed the failure of the Company's business model to gain traction, justified their revenue recognition practices to analysts and represented that a new consortium of medical supply companies would not hurt Ventro's business. Nevertheless, defendants proceeded with the issuance of $250 million in convertible subordinated notes.

43. On April 3, 2000, Deutsche Banc Alex. Brown issued a report on Ventro based on defendants' statements to analyst C. Laughlin, which were made with the intention they would be repeated in analyst reports. The report forecast 2000 revenues of $150 million and a loss of $3.32 per share and stated:

> We believe one of the major overhangs on Ventro shares revolves around concern about the Company's revenue recognition practices. We believe there is more "noise" than "substance" behind those concerns, as a change in policy would have zero impact on current or future operating income, cash flow or returns on invested capital.

> How Does Ventro Recognize Revenues?

> Ventro's current contributing operating subsidiary, Chemdex, generates the majority of its revenues through supplier discounts. Chemdex acts as "principle" on the bulk of purchases made on the Chemdex Marketplace, taking title on purchased goods, bearing credit and return risk, as well as product liability. The Company takes physical ownership for

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 22 -

a brief moment, essentially the time it takes to move the product form the supplier's warehouse to the delivery truck. The gross profit the Company generates reflects the level of supplier discount achieved, or fees charged to the supplier for providing virtual distribution services. As the number of buyers on the Chemdex marketplace grows, the Company should have greater purchasing leverage, which should translate into higher gross margins. Simplistically, gross profit equals net revenues.

*    *    *

Five of the largest medical supply companies (Abott, Baxter, GE Medical, J&J, and Medtronic) announced plans last week to form an independent company to provide e-marketplace and e-procurement solutions to the global health care industry. The new company intends to leverage state-of-the-art B2B e-commerce technology form Ariba and i2, and professional consulting services from IBM and GE, to streamline supply purchasing and provide procurement automation tools for hospitals and other health care providers. The marketplace is expected to launch in 3Q00, with equal funding form the five founding companies. There are no plans to take the company public at this time, though this is a for-profit entity with revenues generated from commissions (likely around 5%) paid by the supplier.

We Prefer Ventro's Buyer-Centric Model

While this supplier consortium represents a powerful new force in the fast emerging health care B2B e-commerce industry (given the share of the medical supply market these companies account for), we believe there are a number of hurdles to the success of this venture. Most notably, we point to the challenges revolving around aggregating buyers and integrating procurement technology with those buyers, as well as intense competition. Importantly, the suppliers involved here are not exclusively listing their products on this new marketplace. Accordingly, we believe health care B2B e-commerce players able to deliver a critical base of buyers (i.e., Promedix and Broadlane through their Tenet partnership and other recently signed deals) will likely remain highly competitive.

44. On April 11, 2000, Ventro announced its fifth vertical market, called Amphire Solutions, Inc. ("Amphire"). The release stated:

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 23 -

With Amphire, Ventro now operates five online B2B operating companies with total addressable markets of over half a trillion dollars.

Amphire Solutions, Inc., formed by Ventro Corporation and food industry e-commerce provider Entangible.com, is a new B2B e-commerce company designed to streamline the procurement of goods for the $150 billion U.S. food service market.  The new operating company has established significant industry support and has entered into strategic marketing alliances with three leading industry distributor groups, Foresight Partners, Premier Foodservice Distributors of America and Goldbon, who in total represent 535 distributors and over $25 billion in food service revenues.

*       *       *

"With the formation of Amphire, Ventro continues to execute on its mission of streamlining fragmented supply chains in multiple industries worldwide," said David Perry, president and CEO of Ventro.  "Each new industry we enter benefits from our ability to bring new companies rapidly to market with the combination of our operational and technical expertise and our partner's deep industry knowledge and participation."

45.  On April 19, 2000, Ventro announced "record" financial results and operating metrics for the first quarter 2000 which ended March 31, 2000.  The release stated:

The net income for the quarter was $29.4 million, or $.70 per share on a diluted basis, which includes a one-time accounting gain of $74.5 million related to the company's investment in TRADEX.  The cash loss, which excludes the one-time accounting gain, as well as non-cash losses related to minority investments and amortization, was $24.1 million, or $(.63) per share on a basic basis and $(.57) per share on a diluted basis, compared to a net loss of $6.5 million or $(3.20) per share on a basic and diluted basis from the first quarter of 1999.

*       *       *

"The first quarter was a defining period of growth for Ventro.  We demonstrated our ability to leverage our assets across new vertical market opportunities by partnering with key industry leaders in several new industry-specific markets," said David Perry, president and chief executive officer of Ventro.  "This strategy allowed us to expand our addressable

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 24 -

market form the initial $20 billion life sciences market to over $350 billion at quarter end, and approximately $500 billion at present with the announcement of our fifth vertical market in the food service industry. At the same time, we extended our lead in the life sciences and specialty medical products markets by continuing to grow our transaction volumes, gross margins dollars and customer accounts."

Continued Perry, "Our strong cash position, along with growing stakes in new vertical market companies, allows us enormous flexibility to execute on our strategy of leveraging Ventro's significant assets across multiple new markets at a time when key industry players are looking to expand their customer solutions through e-commerce channels."

                    *       *       *

-- Continuing its rapid expansion, Ventro announced the launch of its European venture, Ventro Europe, lead by technology industry veteran John Thorpe. Ventro Europe's first operating company, Ventro Life Sciences, leverages the assets of Chemdex to deliver a life sciences marketplace solution to the European community.
-- Ventro completed its acquisition of Promedix, a leading provider of e-commerce solutions for healthcare purchasing professionals, as well as its acquisition of SpecialtyMD.com, which contributes rich product information and enhanced search capabilities to Ventro's e-commerce solutions.

                    *       *       *

-- Subsequent to the end of the quarter, Ventro, in partnership with Entangible.com, announced the formation of Amphire Solutions, its fifth operating company addressing the needs of the $150 billion food service industry. Amphire has announced relationships with three key food industry distributor groups, who in total represent 535 distributors and $25 billion in food service revenues.

46. On April 20, 2000, Prudential Volpe Technology issued a report on Ventro by Timothy Getz based on Getz's conversations with Ventro management (Perry/Stewart). The report rated Ventro a strong buy and stated:

Core Chemdex business continues to show strength and, in our view, has achieved critical mass of suppliers and buyers.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 25 -

-- Grew its enterprise customer list to 127 accounts from 112 at 12/31/99.
-- Transaction growth grew 34% quarter to quarter as discussed on the previous page.
        Raised $250 million in its convertible debt offering.

Expanded internationally by forming Ventro Europe. First venture will be Ventro Life Sciences Europe.

Closed Promedix acquisition.  Promedix continues to gain momentum with contracts with over 500 hospitals. We expect to see initial transactions in Promedix beginning at the end of this quarter.

Broadlane, in its short existence already has 2,400 hospitals under contract, representing 50% of the private hospitals in the US.  We believe there are significant cross-selling opportunities in these hospitals between the Promedix and the Broadlane vertical.

                    *        *        *

Overall, we continue to believe Ventro's business fundamentals and growth prospects are excellent.  In our view, Ventro is effectively executing on its vertical marketplace, leveraging its expertise across multiple high growth vertical.  We believe the Company has developed formidable competitive barriers in terms of partnerships, marketplace knowledge, operating and technical capabilities, and technology architecture. We believe these competitive advantages enable the Company to delivery faster time-to-market, better solutions, and significant cost advantages in multiple vertical market [sic].

47.  On April 20, 2000, USBancorp Piper issued a report on Ventro by Jon Ekoniak based on Ekoniak's conversations with Ventro management.  The report rated Ventor a buy and stated:

-- We expect Ventro to continue its aggressive expansion into additional vertical markets.  Currently Ventro owns or operates companies in five vertical markets; management has stated that they intend to be present in 10 vertical markets by the end of 2000.

-- In our opinion, Ventro's valuation will evolve going forward, as a result of its multi-version expansion.  The Company will be valued off revenues from its wholly owned business units, as well as its equity stakes in new companies, as it becomes clear whether or not the Company can execute its multi-

vertical strategy.

48.  On May 1, 2000, *Forbes* issues an article on problems in the B2B market.  Perry was questioned extensively in the article:

> "The problem is that 90% of the B2B stocks are overvalued and 10% are ridiculously undervalued -- and the challenge is to figure out which is which," says David Perry, chief of Ventro Corp. (formerly known as Chemdex), a B2Ber in Mountain View, Calif.  In health care 40 sites will wither to maybe 10 this year, and to only 3 or 4 by the end of next year, he says.  "There's an opportunity here to build a $100 billion company.  Those that do are ridiculously cheap today.  The others are worth zero."

                         *      *      *

> Setting up a site isn't exactly easy.  It took Ventro, which runs four sites in the medical, life sciences and industrial areas, 19 months to develop its first marketplace, 6 months to launch a second.

                         *      *      *

> Adding confusion, some B2Bers report sales based on the entire value of the goods that pass through their systems, though they don't make, warehouse or ship the goods.  While Neoforma reports only the fees it collects as revenue, Ventro's claim that it will grab $145 million in revenue this year is based on the "grossed-up" figure -- that is, for many transactions, Ventro recognizes the entire value of the orders, rather than its own small cut.  Its real income is a tiny fraction of that $145 million, but its market value is $2.3 billion, 16 times this year's pumped-up sales.

> Ventro says accounting rules require this approach if the middleman takes title to the good being ordered.  Still, "the concern is that these companies are fooling investors into believing there's more revenue growth than there truly is," says Michael Dubrow, a senior analyst with Jacob Asset Management in New York.

49.  On May 4, 2000, Chase Hambrecht & Quist issued a report "initiating coverage" on Ventro by S. Fitzgibbons.  Because this

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 27 -

was Fitzgibbons' first report on Ventro, it was issued only after Fitzgibbons had extensive discussions with Perry, Abrams and Stewart and was based on and repeated information provided by them. The report stated:

* We are initiating coverage of Ventro with a BUY recommendation. Ventro is a leading provider of business-to-business (B2B) e-commerce solutions for multiple vertical markets.

* * *

*  We set a 12-month price target of $60 per share, which is 70x our 2001 net revenue estimate of $36M. We believe Ventro should trade at a premium on a revenue multiple basis to other B2B leaders, given the understated nature of its net revenue line.  Along this line, we believe significant value will be created at Ventro's minority owned affiliates, which do not contribute to the company's top-line.

* * *

Ventro, in our opinion, is well positioned to become a leading online marketplace in several vertical industries.  Currently, the company operates in five vertical markets, including scientific products (Chemdex), speciality medical suppliers (Promedix), commodity medical supplies (Broadlane), fluid processing equipment (Industria), and foodservices (Amphire).  In total, we estimate that Ventro faces a global opportunity greater than $500 billion annually in these five markets, which is split between $20 billion in scientific products, $300 billion in specialty and commodity medical products, $75 billion in fluid processing equipment, and $150 billion in domestic food services.  On a net revenue basis (backing out product costs), Ventro still faces an opportunity in the tens of billions of dollars. Going forward, we look for the company to aggressively expand into other vertical markets through acquisition or partnership. ***Management expects to operate within ten markets by the end of 2000.  Long term, we believe Ventro has the potential to be one of a select few B2B exchange companies that operates on massive scale across the global economy***.

* * *

We believe Ventro now has the technological capabilities, operational experience, capital and public currency, and name recognition to move

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS            - 28 -

effectively into other vertical markets.  Moreover, we believe Ventro can move more quickly, at a lower cost, and with better solution than many of its competitors. Along this line, where as the Chemdex marketplace required 19 months of development and $41 million of investment, Ventro launched its Promedix marketplace (specialty medical products) with less than 5 months of development and $7 million of investment.  Overall, we believe [the] lion's share of the B2B e-commerce opportunity will go to the scale leaders who can move swiftly.  In our opinion, Ventro is well positioned to move quickly and establish the lead in all five of their initial markets.

*       *       *

In the medical products market, Ventro partnered with Tenet Healthcare, the second largest hospital company in the U.S.  The two companies formed a joint venture, Broadlane, that will operate an online exchange focused mainly on commodity medical products.  Ventro currently owns 24% of Broadlane.  The company will benefit from the significant purchasing power of BuyPower, Tenent's group purchasing organization. BuyPower currently manages over 400 vendor contracts that generate more than $3 billion of annual purchases of medical supplies.  In addition, Promedix, Ventro's specialty medical products exchange, formed an exclusive e-commerce relationship with Tenent and Broadline [sic].  This relationship has an eight-year term and applies to any entity for which Tenet acts as a purchasing agent.  Broadlane recently signed a number of additional partners including Amerinet (leading GPO), Universal Health Systems, and the Cleveland Clinic.  In total, Broadlane's current partners represent more than $15 billion of annual product expenditures.

*       *       *

Revenue Outlook

We estimate that Ventro's gross revenues will grow from $31 million in 1999 to $146 million in 2000 and $470 million in 2001.  Breaking out revenues, we look for the Chemdex unit to contribute $136 million to our 2000 outlook and $320 million to 2001.  Promedix should contribute the remaining $10 million and $150 million to 2000 and 2001, respectively.  We do not include any future acquisitions in our model, nor do we include financial contributions from Broadlane, Industria, or Amphire (Ventro is a minority owner in all three cases).

50.  On June 26, 2000 The Wall Street Transcript published

an interview with Perry in which Perry stated:

"What we have done is taken all the assets, all the capabilities that we have built as Chemdex , and now, we are leveraging those capabilities across other markets, but we are able to do that at much less costs and much quicker than somebody who is starting from scratch.  So if you look at those 100 or fewer companies that are going to be surviving three or four years from now, I think most of them will look like Ventro does.  These are multi-vertical companies.  You have to be mulit-vertical in order to make the economics work.

                    *       *       *

    Mr. Perry:  We think of ourselves as having five assets.  The first is the technology architecture that we've built.  Unfortunately, there is still no way to buy a marketplace in a box, despite the press releases from technology companies. We integrate over 40 different software packages, including things like Oracle's database and financial systems. and some of Ariba's transaction systems and so forth.  We take those 40-plus available software packages and put them together to create an end-to-end solution, and then we leverage that architecture into each vertical market, which gives us significant time to market and cost advantages.  We also have a lot of engineers here whose job it is to keep the architecture best of breed and modify it to each new vertical.  So our second asset is our technical capabilities.

    The third one is our operating capabilities; things like customer service and back office operations are equally leveragable here.  We use the same customer service system and people to do customer service across multiple markets.  The fourth one is our partnerships -- by being multivertical we have a much higher profile with people like IBM, Oracle and so forth because we affect a broader range of their business.  Those partnerships are in place for each vertical that we do already.

    The last one is everything we've learned along the way.  I talked earlier about there being over 800 marketplaces today and at last count, 95% of them had not yet done their first transaction.  So what you really have is 800-plus PowerPoint slides without anything else.  Most of these businesses don't yet know what they don't know -- they have no idea what it takes to develop and operate a successful e-market marketplace.  The fact that we've done one well, and we're in the process of doing four more, gives us a huge advantage as we think about new markets and

what's required to be successful there.

\*       \*       \*

Mr. Perry:  The industry consortiums are perceived to be a risk in a lot of these markets.  There are two things here -- one is, what markets do they actually play a role in.  And the second one is, what role will they play when they get there.  I'll address them separately.  First of all, existing players are important in these businesses.  This isn't like Amazon, where their entire goal was to get as far along as they could before the existing players figured out what was going on.  In fact, what we do is connect the existing buyers and sellers -- you have to have the existing players to be interested and believe in B2B commerce before it works.  That's the reason this recent trend is so good for us -- everybody has now decided it's important and they need to get involved.

In some markets where the buyers or sellers are highly concentrated they may want to and may be able to do this themselves.  The example that most people use is the Ford/GM/Chrysler consortium -- there's a case where three buyers do 80%-plus of the domestic buying, and its' pretty hard to create a competitor to that.  Who would you sell to?  That's really an extreme case, and there are other concentrated market son the buyside, the chemical industry being one of them, but for the most part only about 35% of the economy falls under that segment. Well over 50% of the economy falls into the category that we would call fragmented on both sides, so there are no obvious payers to get together and have enough power to do this themselves.  Health care is a great example of that since you have 5,000 hospitals, 8,00 suppliers and none of them do enough business to be able to get together and form their own consortium -- you need some independent market maker to do it.

\*       \*       \*

Mr. Perry:   I would first talk about market opportunity.   When Chemdex went public we were attacking only the life-sciences - it's an attractive market, but it's only $15-$20 billion.  By expanding into what are now four new vertical markets, we have a market opportunity over $500 billion.  We've been able to increase our market opportunity of over 25 times over the last eight or 10 months or so.  That's a big deal.

51.  By late June 2000, Ventro's stock continued to trade in the $20+ range and its convertible subordinated notes traded

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                - 31 -

around $500.  Klintworth took advantage, selling 1.275 million shares of his Ventro stock for $25.5 million.

52.  On July 19, 2000, The San Francisco Chronicle ran an article on Ventro and perry entitled "Building the B2B Hive." The article stated:

> David Perry, the 32-year old founder and chief executive of Ventro Corp. in Mountain View, helped invent the business-to-business online marketplace.

>                    *         *         *

> Today, this is a major part of the B2B market that analysts project could be worth between $2.7 trillion and $7.3 trillion within four years.

> Perry's company seeks to serve a big chunk of it, and Wall Street was enthusiastic, at least at first.

>                    *         *         *

> Perry's new enterprise, dubbed Chemdex over beers in his Boston apartment, started in mid-1997.  It received early financing from Genentech founder Robert Swanson, who died last year, and venture capital firms CMGI and Bay City Capital.

> With one market up and running, Perry began looking at how he might get more bang for the buck out of Chemdex's experience and investment of more than $100 million in technology.  It turned out that the template for the life sciences products industry could be used to transform the business supply chains of other industries that are characterized as "fragmented" for having many suppliers and differently priced products.

>                    *         *         *

> But not everyone is keen on Ventro.  David Hines, president of Avalon Research in Boca Raton, Fla., believes B2B marketplaces such as those offered by Ventro and rival SciQuest are not much different from electronic catalogs provided by companies such as Fisher Scientific.  "We question what value is added," he said.

> Hines also is concerned that Ventro's vendors have nonexclusive contracts that allow them to create competing electronic solutions.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 32 -

And finally, he feels that Ventro and others distort the market potential by talking about the dollar value of all sales transactions instead of their fees from those deals.  "It's like Realtors talking about the value of the houses they sell rather than their commissions."

Hine's bottom line: "The business model is unlikely to produce a profit."

***Perry and his backers disagree.  They say Ventro not only will be profitable but has plenty of cash. Although it has cumulative operating losses of about $150 million, it has close to double that in cash reserves.***

53.  On July 20, 2000, Ventro announced very disappointing second quarter 2000 results.  Ventro's securities dropped on these results but continued to trade at inflated levels due to defendants' positive statements about its business.  The release stated:

The net loss for the quarter was $119.6 million, or $(2.69) per share, which includes a one-time accounting loss of $45.3 million related to the company's investment in Tradex.  The cash loss of $33.1 million or $(.74) per share excludes the accounting loss, as well as non-cash losses related to minority investment and amortization.  This loss was less than the First Call consensus estimate of $(.80). During the corresponding quarter in fiscal year 1999, the net loss was $12.5 million or $(2.86) per share.

*            *            *

"Our focus on managing gross margin dollars continues to allow us to exceed EPS expectations," said David Perry, Ventro's president and CEO.  "While Chemdex revenues grew more slowly than last quarter, transactions and new customer growth continued as a result of our leadership in the life sciences marketplace. Promedix, our specialty medical products company, is well positioned for significant growth in the coming quarters.  Additionally, we were pleased with this quarter's services revenues which contributed to gross margin dollars and which will be increasingly important to our financial results going forward."

"Our margin growth to more than seven percent this quarter is directly related to the evolution of our

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 33 -

business model, which includes delivering value-added services to enhance the marketplace experience for customers, suppliers and other marketplace participants. For example, this past quarter, we were able to provide some of these value-added services to a key distributor and one of our large Fortune 500 customers in two of our marketplace companies," said Perry. "Our thought leadership, first-mover advantage and business agility have positioned us well to continue to expand the revenue model, increase gross margin dollars and deliver a broader range of marketplace services."

54. On this news, Ventro's stock dropped from $20-3/8 to below $14 per share and the convertible subordinated notes fell from $422.30 to $343.80. However, even this news did not reveal that Ventro did not have the technology to successfully run its marketplaces such that Ventro was not in fact positioned to deliver a broader range of marketplace services. Analysts, based on conversations with defendants, continued to forecast 2000 and 2001 revenues of $110+ million and $270+ million, respectively, for Ventro. As a result, Ventro securities continued to trade at artificially inflated levels.

55. On September 25, 2000, Information Week ran an extensive article on Ventro entitled "Online Transactions Are Just The Start For Ventro." The article stated:

Not all that long ago, companies ordered supplies by making phone calls, sending out faxes, or using the electronic data interchange systems they'd built at great expense. Tracking the delivery of those supplies was another hassle - if it happened at all.

These days, online marketplaces promise to change all that, letting businesses order and track products quickly and easily over the Internet. Some of the best-known are operated by Ventro Corp.

Ventro has built and now operates six vertical marketplaces, including Promedix, which specializes in medical supplies; Broadlane, a joint venture with Tenet Healthcare Corp. that deals in health-care commodities; Industria, a fluid-processing joint

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 34 -

venture with DuPont Co. that supplies pipes, vales and fittings; Chemdex, which offers research products for the life sciences market; and Amphire, a food-services marketplace.  Most recently Ventro, in conjunction with American Express Co., launched MarketMile, an exchange for office supplies and services, a market that sees $1.4 trillion worth of business every year.

                    *       *       *

     But online transactions are only the beginning, Ventro CEO David Perry says.  "It becomes really interesting when you allow customers to design their own products with their supplier, and then order those products online," he says.

                    *       *       *

     But for now, many buyers and suppliers are turning to Ventro for the fundamentals, which Ventro says it's able to supply in abundance.  "The technology to build business-to-business marketplace platforms is complex and expensive," says Pierre Samec, Ventro's chief technology officer.  "Plus, you need strong partnerships in order to make it work - and building these can be quite complex, too."

     For example, American Express gives Market Mile the ability to offer secure payment services.  As the company moves to the international front, with the formation last spring of its Ventro Life Sciences European business unit to provide E-procurement of laboratory products for overseas companies, it's partnering with Price Waterhouse Cooper's European Pharmaceutical Practice and IBM.  Ventro has entered into a strategic logistics alliances with Merck Eurolab, the European laboratory products distribution company of Merck KGaA.

                    *       *       *

     Ventro has yet to be profitable.  For its second quarter, ending July 20, the company reported a net loss of $119.6 million, or $2.69 per share, including a one-time accounting loss of $45.3 million related to its investment in Tradex Technologies, a provider of online procurement services and software.  The company said it had a cash loss in the quarter of $33.1 million, or 74 cents per share, excluding the accounting loss.  But what analysts were really eyeing was the $29.1 million the company reported in transactions, which contributed to its total revenue of $25.2 million.  While the total transaction volume was 9% higher than its previous quarter, it was below the $30 million figure analysts were counting on.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 35 -

*        *        *

Perry remains confident about his company's prospects, noting that the business-to-business market is always in flux and that better times are ahead. "We're a stronger company now that we have more assets, and more expertise, than we were when the stock was at $240," he says, "As we enter new markets, we expect that stockholder confidence will go up."

Ventro is betting that its particular business model - based not only on targeting fragmented vertical markets, but on cloning E-marketplace infrastructure across diverse vertical industries, and building partnerships to expand its services - will allow it to grow and thrive.

Despite the company's recent problems, the market would seem to support Ventro's hopes. According to market-research firm IDC, the business-to-business market worldwide is now at $212.8 billion, and 7.5% of that business is going through E-marketplaces like those operated by Ventro. The total market is expected to reach $2.2 trillion by 2004, 56% of which will go through E-marketplaces.

*        *        *

Perry says Ventro will grow through joint ventures and acquisitions. The company will try to figure out which are the most powerful players in each market, and which ones can drive the vertical to liquidity faster than the others. "The further Ventro gets away from life sciences, the more they'll have to do to make themselves the Chemdex of that new market," says Silva.

The good news, CEO Perry says, revolves around Ventro's stringent qualification process for the markets if will enter - examining their average transactions sizes, overall fragmentation, and aggregate revenue.

56. On October 3, 2000, Ventro announced that Amphire, a Ventro operating company "and the leading provider of business-to-business (B2B) e-commerce solutions for the food service industry," had successfully completed its first series of e-procurement transactions.

57. In fact, by this time Amphire was not paying Ventro due

to deteriorating marketplace conditions and Ventro would ultimately write off $5.1 million in fees recorded as due from Amphire.

58. On October 15, 2000, Line56magazine ran an article on Ventro by Tom Kaneshige based on an in depth interview with Perry and other Ventro employees. The article discussed Ventro's investment in technology:

> Infused with new life, the company pocketed another $30 million in April 1999, followed by a successful IPO in July that raised $112 million. But these great strides were crippled by the company's huge investments of money and manpower - more than $50 million and 200 employees - to develop cutting-edge technology.

> The fruit of this labor, though, was essential: a massive application handling everything from order entry to billing, supporting up to 20,000 transactions daily. Hosted at Exodus, run on Sun Microsystems and IBM servers, and connected to an Oracle database, the application leverages features from more than 40 software vendors, including Ariba, WebLogic, and Commerce One.

> An electronic-catalogue feature created entirely in-house accommodations millions of products from thousands of suppliers. "With catalogue systems, there was nothing we could purchase on the market that could support the scale of a Chemdex, so we had to build it ourselves," says Pierre Samec, Ventro's chief technology strategist. "Today our catalogue gets us to 25 million SKUs with subsecond response times on searches."

59. On October 19, 2000, after the close of the market, Ventro announced its results for the third quarter 2000, including revenues of $28.7 million and gross profit of $1.4 million, stating:

> The net loss for the quarter was $76.3 million, or $(1.69) per share. The cash loss of $35.3 million or $(.78) per share excludes non-cash losses related to minority investments and amortization. This loss was less than the First Call consensus estimate of $(.81) per share. During the corresponding quarter in fiscal

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 37 -

year 1999, the net loss was $14 million or $(.59) per share.

* * *

Ventro Operating Company highlights included:

- Amphire Solutions successfully completed its first series of e-procurement transactions only four months after the formation of the company. The IJ Company and URM Food service participated in Amphire's B2B e-commerce technology to facilitate ordering products online for their food service operator customers.

- Amphire Solutions signed exclusive strategic distributor partnerships with the food service industry's leading independent broadline distributors: Gordon Food Service, Reinhard Food service, Inc. and Shamrock Foods Co. With the addition of these new distributor partners, Amphire has achieved resounding industry support, represented by over $35 billion in combined food service volume.

* * *

- Broadlane reached a major milestone by facilitating real-time purchases between 100 Tenet Healthcare Corporation hospitals and Medline Industries, Inc., a major manufacturer and distributor of hospital, medical and surgical supplies.

60. On October 25, 2000, Ventro issued a release regarding its "New Strategic Direction." The release invited investors to the Company Web site to view highlights of its strategy and plans, which included:

- Evolving the business to become a marketplace service provider rather than an owner and operator of vertical marketplaces;

- Increasing gross margins as the company reduces equity stakes in future marketplaces and shifts to revenue from license fees and transaction and services fees;

- Launching new services focused on the following four stages of marketplace life cycles:

  - Business Building

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 38 -

- Marketplace Development

- Transaction Support

- Marketplace Loyalty

- Changing the company's focus from building and operating wholly-owned marketplace to building and servicing marketplaces. As a result, Ventro and its strategic advisors are evaluating alternatives for the Chemdex and Promedix wholly-owned marketplaces, including the possible sale of these marketplaces.

The release also stated:

"Our move toward a MSP models a natural evolution as we continue to leverage the core of our capabilities," said David Perry, president and CEO, Ventro Corporation. "This new model reflects a combination of transaction-based and service-based offerings which will evolve as the dynamic B2B market continues to grow."

61. On November 13, 2000, *VARBusiness* published an entire article about Perry which stated:

Three-and-one-half short year ago, Ventro (nee Chemdex) was little more than a well-thumbed business plan sitting on the hard drive of entrepreneur and Harvard Business School grad David Perry.

Today, Ventro is widely regarded as the most significant driving force in the market for online, B2B e-commerce exchanges. That market is forecasted by Gartner-Group to exceed $7.3 trillion globally by 2004.

*       *       *

Perry says he now understands the benefits of partnerships and of serving multiple markets. In fact, he no longer considers his company to be an exchange company, but rather a "marketplace service provider."

62. Then, on December 6, 2000, Ventro announced a huge restructuring, including the shutdown of both Chemdex and Promedix and charges of $380-$410 million to write off assets and reduce personnel, stating:

The company's Board of Directors, after assessing the

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 39 -

proposals received, has determined that it is in the best interest of shareholders to shut down bot Chemdex and Promedix in an orderly manner. As a result, Chemdex and Promedix will initiate significant layoffs beginning December 31, 2000, to be completed no later than March 31, 2001. Ventro expects that its industry partners will make arrangements to meet the e-commerce needs of the participants in the discontinued marketplaces.

The company expects to record aggregate restructuring charges of approximately $380 - $410 million in its fiscal year-end results in connection with these activities. The Chemdex, Promedix and Ventro. The charges will also include amounts for write downs of certain operating and intangible assets, including goodwill associated with various liabilities. The ultimate amount of restructuring charges will be finalized in connection with the company's year-end close. Ventro estimates that future cash outlays for operating activities will be reduced by 50% after the restructuring is completed.

63. Each of the statements made by defendants between February 15, 2000 and December 6, 2000 were false or misleading when issued. The true facts, which were known to defendants, were:     (a) Ventro did not have adequate technology to run the marketplaces it was announcing, which made its viability as a company dubious;

(b) Due to its lack of competitive advantages, the way Ventro could get companies to use the marketplaces was to offer equity interests in joint ventures or through other partnerships;

(c) Ventro was able to show revenue growth only through grossing up revenues on transactions where it was essentially acting as an agent (taking title temporarily for the sole purpose of being able to claim it had taken title so it could recognize revenue) and by generating fees from joint venture partners, such that Ventro's reported revenue growth was

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 40 -

in no way indicative of a successful business enterprise;

(d)  Partners, including Broadlane and Amphire, were unhappy with Ventro's technology and services and even though these partners had an economic incentive to contribute to Ventro's success, they were increasingly unwilling to work with Ventro;

(e)  Ventro's third quarter 2000 revenues were overstated by some $5.1 million in fees from Amphire due to Ventro's inability to provide the technology and services promised; and

(f)  Ventro was not on track to operate in ten markets by year end 2000 due to its inability to successfully operate in the few markets it already had and thus, defendants knew the revenue forecasts made by and for Ventro for 2000 and 2001 could not and would not be achieved.

64.  Since the December 6, 2000 announcement, the stock price of Ventro has continued to deteriorate and now trades below $1 per share while the convertible subordinated notes are trading in the $180 range.

65.  Subsequently, Perry admitted in a January 2001 magazine interview that the problems with the business model were known internally by December 1999:

> "Think about how fast that is," Perry says.  "You go public as Chemdex in July, by September you're two companies, and by December you realize this idea of independent marketplaces doesn't make sense and you've got to get bricks-and-mortar companies involved. Our entire business changed in a five-month period.  Not externally, but our internal understanding."

66.  On February 20, 2001, Ventro announced its fourth quarter and year end 2000 results, reporting no revenue and

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 41 -

stating:

> The net loss for the three months ended December 31, 3000 was $451.6 million, or $(9.93) per share, and the total loss for the twelve months ended December 31, 2000 was $618.1 million, or ($14.28) per share. These losses compared to prior year quarterly and annual losses of $15.3 million, or $(0.49) per share, and $48.6 million, or $(3.17), respectively. Current period losses include $382.5 million of discontinued operations charges for Chemdex and Promedix, including net operating results for the period, cost of terminating approximately 235 personnel, and write off of certain intangible and other assets. In addition, current period losses include $37.2 million of additional charges for the write down of certain Ventro investments and Ventro restructuring charges.

> Ventro also announced that its Board of Directors had authorized the Company to commence a tender offer for all of its outstanding 6% convertible notes. The notes, of which an aggregate principal amount of $250,000,000 are currently outstanding, were issued in March 2000. The purchase price for the notes will be $270 in cash per $1,000 principal amount, plus accrued and unpaid interest up to, but no including, the date of payment. The Company's purpose in seeking to repurchase the notes is to reduce its annual interest expense and eliminate the need to repay or refinance the debt at maturity in 2007. The Company said that it will file the required documents with the Securities and Exchange Commission and will commence the repurchase of the notes in the near future.

> Ventro also announced that Robin Abrams, Chief Operating Officer, James Stewart, Chief Financial Officer and Martha Greer, Vice President of Marketing, had given the Company notification of their intended departure by the end of the first quarter 2001.

67. Later, it was revealed that Ventro had not possessed the ability to provide the services and technology for the joint venture marketplace agreements it had announced:

> Ventro (VNTR) has been dismissed by two of its marketplace customers, adding to a lengthy list of problems at the beleaguered b-to-b company.

> Broadlane, a healthcare marketplace majority owned by Tenet Healthcare (THC), pulled the plug on its Ventro technology and services contract earlier this month, and is now embroiled in a dispute over billing, according to Ventro's annual securities report filed last week

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 42 -

with the Securities and Exchange Commission.

Ventro is having similar problems with Amphire, a food service marketplace backed by a consortium of food distribution companies. Ventro was forced to write off $5.1 million in fees from Amphire in the fourth quarter, according to its annual report. An Amphire executive also confirms that the marketplace is no longer using Ventro technology.

The loss of business from Broadlane and Amphire raise more questions about Ventro's future and will embolden critics who believe the company is on the verge of collapse.

                    *         *         *

Broadlane was formed in 1999 as a joint venture between Ventro and Tenet Healthcare to create an online marketplace linking hospitals with suppliers of medical supplies and equipment. Tenet owns a 56 percent stake in the venture. Ventro owns 18 percent and was charged with putting together the technology that would build and operate the marketplace. But the relationship between Broadlane and Ventro soured last year.

"Broadlane has stated its belief that we have failed to provide the services and technology required to operate the Broadlane marketplace in the manner and within the time frame established in their technology and services agreement," Ventro disclosed in its annual report.

In addition, Broadlane has withheld $4.4 million in fees that Ventro says it's trying to collect. As a result of this billing fight, "Effective February 16, 2001 [Ventro] stopped providing marketplace services to Broadlane and is in discussions regarding potential settlement of this dispute. Any such settlement is likely to involve termination of all of our agreements with Broadlane and may also involve the transfer or purchase of our interest in its common stock," Ventro disclosed.

Broadlane executives didn't want to comment specifically about the billing dispute, but the marketplace made it clear that Ventro was on the outs.

*"During 2000, it became clear that Ventro did not have the technology that was suitable for Broadlane's use," says David McAdam, a Broadlane spokesman. "As a result, Broadlane is seeking to unwind its agreement with Ventro... We are making every good faith effort to accomplish this, but if these efforts prove fruitless, litigation is a possibility."*

A similar story is unfolding between food service marketplace Amphire, and Ventro, which owns 33 percent of the venture.  In its annual report, Ventro says it wrote off $5.1 million in fees owed by Amphire due to "deteriorating financial conditions" at the marketplace.

Mark Barnekow, president and CEO of Amphire, while choosing not to discuss specifics about any monies allegedly owed to Ventro, did have a problem with the way his marketplace is being characterized.

"At a time when few b-to-b companies are being funded, Amphire has successfully secured the necessary capital to reach profitability," he says.  Barnekow added that Ventro did help form and incubate Amphire, but at this time, the marketplace is building its own technology platform and is no longer working with Ventro.

### DEFENDANTS' INSIDER TRADING

68.  During the Class Period defendants sold the following amounts of their Ventro stock despite adverse information about Ventro's business which they knew had not been disclosed to the public:

| Insider | Date | Shares | Price | $Value |
|---|---|---|---|---|
| Klintworth | 03/03/00* | 100,000 | $220.00** | $22,000,000 |
| | 06/28/00 | 400,000 | $ 22.00 | $ 8,800,000 |
| | 06/29/00* | 75,000 | $ 20.00** | $ 1,500,000 |
| | 06/30/00 | 800,000 | $ 19.00 | $15,200,000 |
| | | 1,375,000 | | $47,500,000 |
| Greer | 03/14/00 | 7,000 | $165.00 | $ 1,155,000 |
| Weber | 03/13/00 | 6,000 | $167.17 | $ 1,003,020 |
| | 03/14/00 | 11,000 | $151.34 | $ 1,664,740 |
| | | 17,000 | | $ 2,667,760 |
| Wambach | 03/09/00 | 17,000 | $187.65 | $ 3,190,050 |
| TOTAL: | | 1,416,000 | | 54,512,810 |

\*    Shares disposed of by gift
\*\*    Closing price on date of disposition

69.  Perry and Klintworth also attempted to benefit by the

inflation in Ventro's stock prices filing to sell 120,000 shares each of their Ventro stock pursuant to Ventro's failed 1.8 million share secondary offering in March 2000.

## CLASS ACTION ALLEGATIONS

70. This is a class action on behalf of purchasers of Ventro publicly traded debt instruments between March 29, 2000 and December 6, 2000, excluding defendants (the "Class"). Excluded from the Class are officers and directors of the Company, as well as their families and the families of the defendants. Class members are so numerous that joinder of them is impracticable.

71. Common questions of law and fact predominate and include whether defendants: (i) violated the 1934 Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated Ventro's stock and debt instrument prices and the extent of and appropriate measure of damages.

72. Plaintiff's claim is typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FIRST CLAIM FOR RELIEF

**For Violation of §10(b) of the 1934 Act Against All Defendants**

73. Plaintiff incorporates ¶¶1-72 by reference.

74. Defendants violated §10(b) and Rule 10b-5 by:

(a) Employing devices, schemes and artifices to

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 45 -

defraud;

(b) Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of Ventro stock.

75. Class members were damaged as they paid artificially inflated prices for Ventro publicly traded debt instruments in reliance on the integrity of the market.

### SECOND CLAIM FOR RELIEF

#### For Violation of §20(a) of the 1934 Act
#### Against Defendants Ventro and Perry

76. Plaintiff repeats and realleges each and every allegation contained above.

77. Ventro and Perry, the Company's President and CEO, acted as controlling persons of Ventro within the meaning of §20(a) of the 1934 Act. By reason of his position -- and his stock ownership -- Perry had the power and authority to cause Ventro to engage in the wrongful conduct alleged. Ventro controlled each of its employees and each of the Individual Defendants.

### THIRD CLAIM FOR RELIEF

#### For Violations of Section 11 of the
#### Securities Act Against All Defendants

78. Plaintiff repeats and realleges each and every allegation contained above. This Count is brought by plaintiff pursuant to Section 11 of the Securities Act, 15 U.S.C. §§ 77k,

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS            - 46 -

on behalf of the Class, against all defendants and does not sound in fraud.

79. The Registration Statement and Prospectus for the Offering were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

80. The Company is the registrant for the Offering. The Underwriter Defendants were the lead underwriters of the $250 million 6% Convertible Subordinated Notes sold in the Offering as defined in Section 11(a)(5) of the Securities Act. The defendants named herein were responsible for the contents and dissemination of the Registration Statement and the Prospectus.

81. As issuer of the debt instruments, Ventro is strictly liable to plaintiff and the other members of the Class for the misstatements and omissions. The Underwriter Defendants are also strictly liable for their sale of $250 million 6% Convertible Subordinated Notes pursuant to the Offering.

82. As underwriters of the Offering, each of the Underwriter Defendants owed to the purchasers of the $250 million 6% Convertible Subordinated Notes, including plaintiff and the other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus at the time it became effective, to ensure that said statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS        - 47 -

Underwriter Defendants knew, or in the exercise of reasonable care, should have known of the material misstatements and omissions contained in the Prospectus as set forth herein. As such, the Underwriter Defendants are liable to plaintiff and the other members of the Class.

83. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading.

84. Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Prospectus, which misrepresented or failed to disclose, inter alia, the adverse facts set forth above. By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

85. Plaintiff acquired its convertible subordinated notes issued pursuant to the Registration Statement and Prospectus.

86. Plaintiff and the other members of the Class have sustained damages. The value of the convertible subordinated notes has declined substantially subsequent to, and due to, defendants' violations.

87. At the times they purchased the debt instruments, plaintiff and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged

herein and could not have reasonably discovered those facts prior to the Offering. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this Petition is based to the time that plaintiff filed this Petition. Less than three years have elapsed from the time that the securities upon which this Count is brought were bona fide offered to the public to the time plaintiff filed this Petition.

## FOURTH CLAIM FOR RELIEF

**For Violations of Section 15 of the Securities Act
Against Defendants Perry, Stewart, Klintworth, Burke, Byers,
Callaghan, Nowak, Pritzker, Seligman and Wilkerson**

88. Plaintiff repeats and realleges each and every allegation contained above.

89. This Count is brought by plaintiff pursuant to Section 15 of the Securities Act against Defendants Perry, Stewart, Klintworth, Burke, Byers, Callaghan, Nowak, Pritzker, Seligman and Wilkerson and does not sound in fraud.

90. Defendants Perry, Stewart, Klintworth, Burke, Byers, Callaghan, Nowak, Pritzker, Seligman and Wilkerson were control persons of Ventro by virtue of their positions as directors and/or senior officers of Ventro or controlling shareholder. Finally, each had a series of direct and/or indirect business and/or personal relationships with other directors and/or major shareholders of Ventro.

91. Defendants Perry, Stewart, Klintworth, Burke, Byers, Callaghan, Nowak, Pritzker, Seligman and Wilkerson were culpable

participants in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the Offering to be successfully completed.

92.  As a result of the foregoing, plaintiff and the other members of the Class suffered damages.

## STATUTORY SAFE HARBOR

93.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false forward-looking statements pleaded.  The safe harbor does not apply to false financial statements, and none of the forward-looking statements pleaded were identified as "forward-looking statements" when made.  Neither did meaningful cautionary statements, identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, accompany those forward-looking statements.  each of the forward-looking statements alleged was made by or authorized by an executive officer of Ventro and was actually known by each of the Individual Defendants to be false when made.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.  Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 50 -

B.   Awarding plaintiff and other members of the Class damages together with interest thereon;

C.   Awarding plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.   Awarding plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  May 2, 2001

                                    WOLF HALDENSTEIN ADLER
                                      FREEMAN & HERZ LLP
                                    FRANCIS M. GREGOREK
                                    BETSY C. MANIFOLD
                                    FRANCIS A. BOTTINI, JR.
                                    Symphony Towers
                                    750 B. Street, Suite 2770
                                    San Diego, California 92101
                                    Telephone: 619/239-4599

                                    WOLF HALDENSTEIN ADLER
                                      FREEMAN AND HERZ LLP
                                    FRED T. ISQUITH
                                    LAWRENCE P. KOLKER
                                    MICHAEL JAFFE


                                    _____
                                    MICHAEL JAFFE (133332)


                                    270 Madison Avenue
                                    New York, NY  10016
                                    Telephone: 212/545-4600

VENTRONOTES/226386

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 51 -